**COMMONWEALTH of Pennsylvania, Appellant**

v.

**Paul L. REEFER, Appellee.**

Superior Court of Pennsylvania.

Argued Sept. 19, 2002.
Filed Jan. 30, 2003.

---

James R. Gilmore, Assistant District Attorney, Pittsburgh, for Com., appellant.

Kurt A. Grubschmidt, Pittsburgh, for appellee.

Before: LALLY–GREEN, BENDER, GRACI, JJ.

GRACI, J.

¶ 1 Appellant, the Commonwealth, appeals from the order entered on May 2, 2001, modifying the sentence of Appellee, Paul Reefer, from five to twenty years imprisonment to five to twelve years and three months imprisonment, followed by a period of seven years and nine months probation, the probation being conditioned

on Mr. Reefer residing in a court-approved skilled nursing facility.[1] After careful review, we reverse, reinstate the original sentence, order recommitment, and remand for further proceedings consistent with this Opinion.

## I. FACTUAL AND PROCEDURAL HISTORY

¶ 2 On April 14, 1999, Mr. Reefer filed a *pro se* "Petition for Modification of Sentence Due to Illness," 61 P.S. § 81, seeking a modification of the five to twenty year sentence that he was serving for rape, 18 Pa.C.S.A. § 3121(1), involuntary deviate sexual intercourse, 18 Pa.C.S.A. § 3123(1), and corruption of minors, 18 Pa.C.S.A. § 6301. On July 27, 1999, the trial court appointed counsel to represent Mr. Reefer.

¶ 3 On July 25, 2000, Mr. Reefer's expert witness, Dr. Carla Fox, was deposed, and on October 6, 2000, a hearing was conducted during which medical evidence was presented on behalf of Mr. Reefer. On October 12, 2000, the trial court directed that medical records and summaries of medical opinions be introduced in place of live testimony from the treating physicians, and, on November 16, 2000, a second hearing was held during which the Commonwealth presented its medical evidence.

¶ 4 On December 1, 2000, the Commonwealth and Mr. Reefer stipulated to the following findings, in their words:

1. Petitioner, Paul Reefer, suffers from inoperable coronary heart disease, peripheral vascular disease and chronic obstructive pulmonary disease. Such conditions constitute a serious chronic medical condition.

2. Paul Reefer was previously incarcerated at SCI Laurel Highlands and was transferred to SCI Cresson on June 27, 2000. At the time of his transfer from SCI Laurel Highlands, Petitioner was receiving the following medications: Naprosyn (Advil) 250 mg., Alprazolam 1 mg., Reglan 10 mg., Peri–Colace, Tylenol 1000 mg., Nitoglycerin tablets, Maalox 30cc., Nupercainal Ointment, Albuterol Inhaler, ASA (buffered aspirin) 325 mg., Multivitamin, Vitamin E 400IU, Colace 100 mg., Peri–Colace, Liptor 10 mg., Cardizem 30 mg., Lopressor 25 mg., and Tagamet 800 mg.

3. Paul Reefer is currently under the care of Anton Skerl, MD at SCI Cresson and is receiving the following medications: Tagamet 800mg., Peri–Colace, Isordil 20mg., Tylenol 1000 mg., Nitoglycerin, tablets Albuterol Inhaler, ASA (buffered aspirin) 325mg., Liptor 20mg. and Lopressor 25mg.

4. The frequency and dosage of the medications listed in paragraphs 2 and 3, *supra*, are set forth in Dr. Anton Skerl's medical report of November 14, 2000 which has been previously entered into evidence by the Commonwealth.

Order of Court, 12/1/00.

¶ 5 Mr. Reefer filed a memorandum of law with the trial court, asserting that Section 81 provides the sentencing court with broad discretion to modify a prisoner's sentence. On December 7, 2000, the Commonwealth filed an answer to the memorandum, arguing that Section 81 allows the trial court to temporarily modify the place of confinement, but not the length of confinement, and that Section 81 is not the proper avenue to address a question of the "quality" of care provided to a prisoner. Mr. Reefer filed a reply, stating that the Commonwealth's argument that Section 81 may only be inter-

---

1. On November 5, 2001, the trial court granted Mr. Reefer's petition to change the language "skilled nursing facility" to "personal care facility." *See* note 4, *infra*.

preted to allow for the temporary transfer of Mr. Reefer "makes little sense" because Mr. Reefer's illness is not temporary.

¶ 6 On December 13, 2000, Mr. Reefer filed an "Expert Witness Medical Report & Curriculum Vitae" in which Dr. Fox stated that Mr. Reefer's medical care at the State Correctional Institution at Cresson ("Cresson") was inadequate. On January 5, 2001, the Commonwealth filed a report in which Dr. Skerl, Mr. Reefer's treating physician at Cresson, stated that Mr. Reefer was receiving adequate treatment.

¶ 7 On February 2, 2001, a final hearing was held, during which a witness for Mr. Reefer testified that he could help place Mr. Reefer into a skilled nursing care facility in the event that the court granted Mr. Reefer's petition and released him. On May 1, 2001, the court granted Mr. Reefer's petition, modifying Mr. Reefer's sentence to five to twelve years and three months imprisonment, followed by seven years and nine months probation, the probation being conditioned on Mr.

Reefer residing in a court-approved skilled nursing facility.[2] The new sentence altered the term of imprisonment to time served and placed Mr. Reefer on probation for a term equal to the unserved remainder of the original term of imprisonment.

¶ 8 On May 7, 2001, the Commonwealth filed a notice of appeal, creating an automatic supersedeas; thus, Mr. Reefer was to remain in prison pending the outcome of the appeal. See Pa.R.A.P. 1764 and 1736(b). On May 9, 2001, the court ordered the Commonwealth to file a 1925(b) statement, Pa.R.A.P.1925(b), and the Commonwealth did so on May 21, 2001.

¶ 9 On June 4, 2001, Mr. Reefer filed an application for modification of the automatic stay created by the Commonwealth's appeal. On July 3, 2001, the trial court granted Mr. Reefer's application, directing that he be transferred to a skilled nursing facility pending the outcome of the Commonwealth's appeal.[3]

¶ 10 On October 26, 2001, Mr. Reefer petitioned the trial court for modification of the May 1 and July 3, 2001

---

**2.** In its opinion, the trial court stated that "the Parole Board continued to reject [Mr. Reefer's] applications for parole... [F]rom [Mr. Reefer's] point of view, he has been doing all that the correctional system has demanded of him, behavior that in the ordinary course should have resulted in his release in 1994." Opinion, 5/1/01, at 2. This was not a proper consideration by the trial court and may have motivated the decision to release Mr. Reefer. Parole of prisoners sentenced to more than two years imprisonment such as Mr. Reefer is exclusively within the province of the Pennsylvania Board of Probation and Parole. See Commonwealth v. Tilghman, 438 Pa.Super. 313, 652 A.2d 390, 391 (1995) (citations omitted); see also 61 P.S. §§ 331.17 and 331.21. The sentencing court has a right to be heard on the question of parole, but does not control the decision. See 61 P.S. § 331.18. Under our parole system, the expiration of the minimum sentence merely allows a prisoner to be considered for parole. See Rogers v. Pennsylvania Board of

Probation and Parole, 555 Pa. 285, 724 A.2d 319, 321 n. 2 (1999) (citations omitted). A prisoner otherwise has no entitlement to parole. See id. Parole, under these circumstances, is a matter of legislative grace vested in the discretion of the Parole Board. See Tilghman, 652 A.2d at 391; see also 61 P.S. §§ 331.17 and 331.21. It is not a matter of concern for the court. Moreover, it is absolutely irrelevant that Mr. Reefer may have thought he did everything demanded of him and that he should have been released by now. These are matters within the exclusive discretion of the Parole Board, and, on this record, we have no idea why the Board has not deemed it appropriate to grant parole to Mr. Reefer. This is not a matter into which the courts can (or should) inquire.

**3.** This Court denied the Commonwealth's emergency application for reinstatement of the automatic stay, and the Pennsylvania Supreme Court denied review.

orders, requesting that the language in the orders be changed from "skilled nursing facility" to "personal care facility" since Mr. Reefer had trouble obtaining placement in a "skilled nursing facility." On November 5, 2001, the court granted Mr. Reefer's petition, with the condition that electronic monitoring be provided.[4] On November 9, 2001, the trial court ordered the release of Mr. Reefer from Cresson to New Life Personal Care Home in McKeesport, Pennsylvania.

¶ 11 The Commonwealth now raises the following questions for our review:

I. Did the trial court err by illegally modifying appellee-Reefer's sentence exceeding the scope of the remedy provided by 61 P.S. § 81?

II. Did the trial court err in determining that the state correctional system was not capable of providing adequate medical care to appellee-Reefer?

Appellant's Brief, at 4.

## II. DISCUSSION

¶ 12 The lower court based its modification of Mr. Reefer's sentence on 61 P.S. § 81, which reads:

> Illness of prisoner; removal for treatment
>
> Whenever any convict or person is confined in any jail, workhouse, reformatory, or reform or industrial school, penitentiary, prison, house of correction or any other penal institution, under conviction or sentence of a court, or is so confined while awaiting trial or confined for any other reason or purpose and it is shown to a court of record by due proof that such convict or person is seriously ill, and that it is necessary that he or she be removed from such penal institution, the court shall have power to modify its sentence, impose a suitable sentence, or modify the order of confinement for trial, as the case may be, and provide for the confinement or care of such convict or person in some other suitable institution where proper treatment may be administered. Upon the recovery of such person, the court shall recommit him or her to the institution from which he or she was removed.

61 P.S. § 81.[5]

 ¶ 13 We will review the lower court's order for an abuse of discretion. We will only reverse where the trial court

---

**4.** "[A]fter an appeal is taken ... the trial court ... may no longer proceed further in the matter." Pa.R.A.P. 1701(a); *see also* 42 Pa.C.S.A. § 5505, and *infra*. However, under limited circumstances, even where the trial court would normally be divested of jurisdiction, it may have the power to correct patent and obvious mistakes. *Commonwealth v. Klein*, 566 Pa. 396, 781 A.2d 1133, 1135 (2001) (stating that patent and obvious mistakes include mistakes in the record, mistakes by the clerk or officer of the court, and inadvertencies of counsel). Moreover, the trial court may "[t]ake any action directed or authorized on application by the appellate court." Pa.R.A.P. 1701(b)(5). The language "skilled nursing facility" in the trial court's original order is not a patent and obvious mistake, for it was neither a mistake in the record nor a mistake by a clerk or officer of the court. Moreover, it was not an inadvertency of counsel, for Mr. Reefer's counsel requested the change to "personal care facility" after he consciously looked for, but could not find, a "skilled nursing facility" for Mr. Reefer. *See* Petition for Modification of Court Order, 10/26/01. Further, the record does not indicate that this Court authorized or directed the trial court to change the language "skilled nursing facility" to "personal care facility." Thus, the trial court lacked jurisdiction to grant such a change.

**5.** Section 81 was originally enacted in 1919. In its original form, it read as follows:

> Section 1. Be it enacted, & c., That whenever any convict or person is confined in any jail, workhouse, reformatory, or reform or industrial school, under sentence of a court of record, and it is shown to the court by due proof that such convict or

"misapplies the law, or its judgment is manifestly unreasonable, or the evidence of record shows that [its] decision is a result of partiality, prejudice, bias, or ill will." *Commonwealth v. Dunlavey,* 805 A.2d 562, 564 (Pa.Super.2002) (citation omitted) (applying standard in case involving Section 81).

¶ 14 The Commonwealth argues that the trial court illegally modified Mr. Reefer's sentence. Appellant's Brief at 32–42. Specifically, the Commonwealth argues that the language in Section 81 "modify its sentence" refers to modification of the place at which the sentence is being served. *Id.* Mr. Reefer, on the other hand, argues that that language also refers to modification of length of sentence. Appellee's Brief at 7–17. We agree with the Commonwealth and find that the lower court misapplied the law.

¶ 15 "When the words of a statute are clear and free from all ambiguity, the letter of it is not to be disregarded under the pretext of pursuing its spirit." *Campbell,* 758 A.2d 1231, 1234 (Pa.Super.2000) (citing 1 Pa.C.S.A. § 1921(b)). The Commonwealth interprets the language "modify its sentence" in Section 81 as modification of place of confinement, while Mr. Reefer argues that that language may also be interpreted as modification of length of confinement.[6] That language of Section 81 is ambiguous. *See Commonwealth v. Thomas,* 743 A.2d 460, 465 (Pa.Super.1999) (stating that the language of a statute is ambiguous "only where it will bear two or more meanings") (citations omitted).

¶ 16 "In construing the enactments of the legislature, appellate courts must refer to the provisions of the Statutory Construction Act." *Commonwealth v. Campbell,* 758 A.2d 1231, 1233–34 (Pa.Super.2000) (citing *Key Sav. & Loan Ass'n v. Louis John, Inc.,* 379 Pa.Super. 226, 549 A.2d 988, 990 (1988); 1 Pa.C.S.A. § 1901). "In determining the meaning of a statute, we are obliged to consider the intent of the legislature and give effect to that intention." *Id.* at 1234 (citation omitted). "The object of all interpretation and construction of statutes is to ascertain and effectuate the intention of the General Assembly. Every statute shall be construed, if possible, to give effect to all its provisions." *Id.* (citing 1 Pa.C.S.A. § 1921(a)).

> When the words of the statute are not explicit, the intention of the General Assembly may be ascertained by considering, among other matters:
>
> (1) The occasion and necessity for the statute.
>
> (2) The circumstances under which it was enacted.

person is seriously ill, and that it is necessary that he or she be removed from such jail, workhouse, reformatory, or reform or industrial school, the court shall have power to modify its sentence, and provide for the confinement or care of such convict or person in some other suitable institution where proper treatment may be administered. Upon the recovery of such person, the court shall recommit him or her to the jail, workhouse, reformatory, or reform or industrial school from which he or she was removed.

Section 2. If any person so removed under an order of court, as provided in the first section of this act, shall escape, he or she, so offending, shall, upon conviction thereof, be guilty of the crime of breach of prison.

Act of May 31, 1919, P.L. 356.

**6.** Motions to modify sentence are specifically provided for in the Rules of Criminal Procedure. *See* Pa.R.Crim.P. 720 and 721. Both the Commonwealth and the defendant may seek modification. *See* Pa.R.Crim.P. 720 and 721. Sometimes those motions seek to change (*or* modify) the place of confinement. Oftentimes, they seek to change (*or* modify) the length of a sentence. Accordingly, we agree that the language "modify its sentence" in Section 81 can be interpreted to mean modification of place of confinement and/or length of confinement.

(3) The mischief to be remedied.

(4) The object to be attained.

(5) The former law, if any, including other statutes upon the same or similar subjects.

(6) The consequences of a particular interpretation.

(7) The contemporaneous legislative history.

(8) Legislative and administrative interpretations of such statute.

*Id.* (citing 1 Pa.C.S.A. § 1921(c)). Therefore, pursuant to the Statutory Construction Act, we may consider the occasion for Section 81 and former statutes involving sentencing that were in existence when Section 81 was enacted in order to determine what the General Assembly intended by the language "modify its sentence" in Section 81.

■ ¶ 17 In 1919, when Section 81 was enacted, the Act of February 28, 1905, P.L. 25, § 1,[7] indicated that a court's "sentence" was to include the "place of imprisonment." Under Section 1021, courts were directed to sentence persons who were to be imprisoned for one or more years to the "state penitentiary for the proper district." Act of February 28, 1905, P.L. 25, § 1, *amending* Act of March 31, 1860, P.L. 427, § 74.[8] *See Commonwealth v. Arbach,* 113 Pa.Super. 137, 172 A. 311, 312 (1934) (stating that, under the Act of February 28, 1905, P.L. 25, courts could choose a prisoner's place of confinement where, for example, "the act defining the offense and fixing

---

7. (19 P.S. § 1021), *amending* Act of March 31, 1860, P.L. 427, § 74, *amended by* Act of July 17, 1935, P.L. 1165, § 1, and *repealed by* Act of April 28, 1978, P.L. 202, § 2(a)[377].

8. The Act originally read as follows:
AN ACT To Consolidate, Revise and Amend the Laws of this Commonwealth relating to Penal Proceedings and Pleadings.
. . .
TITLE VI. *General Provisions.*
. . .
74. Sentences of separate or solitary confinement.
. . .
Whenever any person shall be sentenced to imprisonment at labor by separate or solitary confinement, for any period not less than one year, the imprisonment and labor shall be had and performed in the state penitentiary for the proper district: *Provided,* That nothing in this section contained shall prevent such person from being sentenced to imprisonment and labor, by separate or solitary confinement, in the county prisons now or hereafter authorized by law to receive convicts of a like description: *And provided, also,* That no convict shall be sentenced by any court of this commonwealth, to either of the penitentiaries thereof, for any term which shall expire between the fifteenth of November and the fifteenth of February of any such year.
. . .

Act of March 31, 1860, P.L. 427, § 74. It was amended once before 1919, when Section 81 was enacted, to read as follows:
AN ACT Amending the seventy-fourth section of an act, entitled "An act to consolidate, revise and amend the laws of this Commonwealth relating to penal proceedings and pleadings," approved the thirty-first day of March, eighteen hundred and sixty, by repealing the proviso thereof which prohibits the imposing of sentences to expire between the fifteenth days of November and the fifteenth of February, of any year.
. . .
Section 74. Whenever any person shall be sentenced to imprisonment at labor by separate or solitary confinement, for any period not less than one year, the imprisonment and labor shall be had and performed in the State Penitentiary for the proper district: Provided, That nothing in this section contained shall prevent such person from being sentenced to imprisonment and labor, by separate or solitary confinement, in the county prisons now or hereafter authorized by law to receive convicts of a like description.
. . .
Act of February 28, 1905, P.L. 25, § 1.

the penalty expressly gives such option"). Moreover, prior to 1919, when Section 81 was originally enacted, there were several other acts directing sentencing courts to select the place of confinement from between the state penitentiaries or the county prisons. *See*, for example, Act of April 8, 1848, P.L. 399, § 4, *repealed by* Act of December 27, 1965, P.L. 1237, § 5; Act of February 19, 1850, P.L. 89, § 3, *repealed by* Act of July 2, 1937, P.L. 2779, § 1; and Act of January 19, 1863, P.L. 3, § 2, *repealed by* Act of April 28, 1978, P.L. 202, § 2(a)[413].[9] Thus, a court's "sentence" included the place at which the sentence was to be served. It was against this historical backdrop that Section 81 was enacted. As it relates to sentenced prisoners, Section 81 allows a sentencing court,

[w]henever any convict ... is confined in any ... penitentiary ... or any other penal institution, under conviction or sentence of a court ... and it is shown to a court of record by due proof that such convict ... is seriously ill, and that it is necessary that he or she be removed from such penal institution, the court shall have power to modify its sentence ... and provide for the confinement or care of such convict ... in some other suitable institution where proper treatment may be administered. Upon the recovery of such person, the court shall recommit him or her to the institution from which he or she was removed.

61 P.S. § 81. By its very terms and its historical context, then, we find that the General Assembly intended that the language "modify its sentence" in Section 81 refer to modification of the place at which the sentence is being served.[10]

---

9. A current version of those acts is at 42 Pa.C.S.A. § 9762, which states that:
 All persons sentenced to total or partial confinement for:
 (1) maximum terms of five or more years shall be committed to the Bureau of Correction for confinement;
 (2) maximum terms of two years or more but less than five years may be committed to the Bureau of Corrections for confinement or may be committed to a county prison within the jurisdiction of the court;
 (3) maximum terms of less than two years shall be committed to a county prison within the jurisdiction of the court except that as facilities become available on dates and in areas designated by the Governor in proclamations declaring the availability of State correctional facilities, such persons may be committed to the Bureau of Correction for confinement.
 42 Pa.C.S.A. § 9762.

10. Moreover, "the title is always a part of a statute or ordinance and, as such, may be considered in construing the enactment, but it is in no sense conclusive, particularly when there is no ambiguity in the body of the statute or ordinance itself." *Campbell*, 758 A.2d at 1237 (citation omitted). "[T]he title, preamble, headings, and other divisions of a statute may be considered in the construction but shall not be considered to control." *Id.* (citing *Boring v. Erie Ins. Group*, 434 Pa.Super. 40, 641 A.2d 1189, 1192 (1994); 1 Pa. C.S.A. § 1924).
 On May 31, 1919, when Section 81 was enacted, its title read: "AN ACT Authorizing courts of record to remove convicts and persons confined in jails, workhouses, reformatories, and reform or industrial schools, who are seriously ill, to other institutions; and providing penalties for breach of prison." Act of May 31, 1919, P.L. 356. The Act was amended once, on January 26, 1966, so that the title read: "AN ACT Authorizing courts of record to remove convicts and persons confined in jails, workhouses, reformatories, reform or industrial schools, *penitentiaries, prisons, houses of correction or any other penal institutions*, who are seriously ill, to other institutions; and providing penalties for breach of prison." Act of January 26, 1966, P.L. 1593 (emphasis added to reflect the language added by the amendment). Our examination of the title under which Section 81 falls reinforces our conclusion that Section 81 refers to the place at which the sentence is being served and not to the length of the sentence. That is the import of the authorization to "remove ... to other institutions." No language in the act or its title suggests any reduction in sentence.

¶ 18 Moreover, the language of Section 81 and its historical context, as noted above, does not yield the conclusion that the General Assembly was authorizing the sentencing courts to shorten the length of the sentence. Directing those courts to "recommit" such prisoners contradicts such a construction and would virtually write that word out of the statute. Words in statutes are not to be considered surplus. *Commonwealth v. Lassiter,* 554 Pa. 586, 722 A.2d 657, 660 (1998) (citation omitted). Instead, we are to give effect to every word. *Id.* Our construction does so.

¶ 19 We also note that a trial court's power to modify a sentence that it imposed has always been limited. *See In re Moskowitz,* 329 Pa. 183, 196 A. 498, 502 (1938) (stating that "[a] court may not legally resentence a criminal after the term has ended... If it were permissible to amend, modify or reverse sentences without this limitation the entire administration of criminal justice would be disrupted and manifest abuses would result"); *Commonwealth v. Harrison,* 142 Pa.Super. 453, 16 A.2d 665, 667 (1940) (stating that "[a]fter term, a court is without authority to interfere either by increasing or reducing the punishment imposed"); *Commonwealth ex rel. Nagle v. Smith,* 154 Pa.Super. 392, 36 A.2d 175, 176 (1944) (stating that a court may not legally resentence a criminal after the term has ended); *Commonwealth ex rel. Nagle v. Myers,* 191 Pa.Super. 495, 159 A.2d 261, 263 (1960) (stating that a sentencing court was without power to alter sentences sixteen years after expiration of term of court at which sentences were imposed so as to make them concurrent instead of consecutive where penalty inflicted was not in excess of that prescribed by law); *Commonwealth ex rel. Gaynor v. Maroney,* 199 Pa.Super. 81, 184 A.2d 409, 410 (1962) (stating that "[i]t was within the power of the lower court to reconsider the original sentences it had imposed and to either reduce or increase them in penalty

or severity so long as the term during which the original sentence was imposed had not expired"); *Commonwealth v. Zelnick,* 202 Pa.Super. 129, 195 A.2d 171, 173 (1964) (stating that "[t]he court has full power to reconsider the original sentences and to reduce or increase them so long as the term during which the original sentence was imposed had not expired"). The legislature extended the time in which a sentence could be modified from the term of court to thirty days in 1959. *See* Act of June 1, 1959, P.L. 342. That extension persists today. *See* 42 Pa.C.S.A. § 5505 (stating that a trial court may modify a sentence within thirty days after entering its order so long as there is no appeal). *See also* Pa.R.A.P. 1701(a) (precluding trial court action after an appeal is taken) and Pa.R.Crim.P. 720(B)(3)(a) (stating that a trial court may modify a sentence within 120 days after a defendant files a timely post-sentence motion to modify his or her sentence).

¶ 20 In the instant case, the time limits for modifying a sentence pursuant to 42 Pa.C.S.A. § 5505, Rule 1701(a) of the Pennsylvania Rules of Appellate Procedure, and Rule 720(B)(3)(a) of the Pennsylvania Rules of Criminal Procedure have expired. Thus, the trial court appears to have been without power to modify the length of Mr. Reefer's sentence.

¶ 21 We view Section 81, in its historical and proper context, as a limited exception to this temporal limitation which, by its language, allows a court to change the place of confinement but not the length.

¶ 22 Further, we note that, since its original enactment, this Court has only addressed Section 81 seven times. *See Commonwealth v. Lightcap,* 806 A.2d 449 (Pa.Super.2002); *Dunlavey,* 805 A.2d 562; *Commonwealth v. Tuddles,* 782 A.2d 560 (Pa.Super.2001); *Commonwealth v. Deaner,* 779 A.2d 578 (Pa.Super.2001); *Com-*

monwealth v. O'Neil, 393 Pa.Super. 111, 573 A.2d 1112 (1990); Commonwealth v. Landi, 280 Pa.Super. 134, 421 A.2d 442 (1980); and Commonwealth v. Pifer, 215 Pa.Super. 125, 256 A.2d 878 (1969), reversed by 440 Pa. 172, 269 A.2d 909 (1970). None of the appellants in any of those cases have specifically raised the issue of whether the language "modify its sentence" in Section 81 refers to modification of the place of sentence or the length of sentence. In Landi, 421 A.2d at 444, this Court observed that "if appellant is dissatisfied with his prison conditions his remedy is not to attack his sentence as excessive but to petition prison authorities for a transfer to a facility better equipped to attend to his special needs." In Tuddles, 782 A.2d at 563, we explained that "Section 81 is clearly meant to recognize the authority to transfer from one institution to another" and that it was inappropriate for a Section 81 petitioner to seek, not a transfer, but release on house arrest. In Dunlavey, 805 A.2d at 563, the trial court modified the length of the prisoner's sentence, from seven to twenty years imprisonment to fifteen years probation. In reversing the trial court, this Court noted that Section 81 "only provides for a temporary release to seek medical treatment until recovery occurs;" thus, "the trial court abused its discretion since it ordered [Dunlavey] to be permanently released."

Id. at 565, n. 6. We believe that these cases support our conclusion that the language "modify its sentence" in Section 81 in context refers to place of sentence rather than length of sentence.

## III. CONCLUSION

¶ 23 We are not unmindful of the problems posed by aging prisoners. We may not address them by rewriting acts of the General Assembly. It is the province of that body to address them in the exercise of its policymaking discretion. Section 81 does not do so. Instead, we find that Section 81 provides the trial court with the limited authority to modify only the place of confinement and not the length of confinement. We, therefore, reverse the order granting Mr. Reefer's petition, reinstate his original sentence, order that he be recommitted, and remand this matter for proceedings consistent with this Opinion. Upon remand, the trial court may determine if Mr. Reefer is eligible for relief under Section 81 as interpreted in this Opinion.[11]

¶ 24 Reversed. Remanded for further proceedings consistent with this Opinion. Jurisdiction relinquished.

¶ 25 BENDER, J., files a concurring and dissenting opinion.

---

11. The trial court must decide whether SCI Cresson is capable of providing adequate medical care to Mr. Reefer. In order to show that it is necessary that he be removed for medical treatment under Section 81, a petitioner must allege that his facility lacks the resources to treat him or that its collective health is endangered by his illness. Dunlavey, 805 A.2d at 564. A petitioner's allegations that his facility lacks the resources to treat him must go beyond quality or neglect in treatment and address the inability of the prison facility to provide adequate care. Id. at 565 (stating that a prison provides adequate care where it "has been and is preparing to handle any and all of [the prisoner's] medical conditions"); Tuddles, 782 A.2d at 563 (stating that Section 81 is not intended to address a prisoner's complaint of neglect in treatment and medication); Deaner, 779 A.2d at 581 (stating that Section 81 is "not intended to address alleged general shortcomings in the provision of medical care in the state prison system") (citation omitted); cf. Lightcap, 806 A.2d at 453 (stating that, where a prisoner's liver disease has "progressed to such a point where it has become a life-threatening situation and the only available treatment is a liver transplant" and a liver transplant is "not available" to the prisoner, the prisoner has made a prima facie claim under Section 81).

BENDER, J., Concurring and Dissenting.

¶ 1 I agree with the majority that the May 2, 2001 order granting relief under 61 P.S. § 81 must be reversed. However, I write separately because, in my view, (1) the meaning of section 81 is clear, so we do not have to examine its legislative history; and (2) we do not have to remand for a hearing because the record contains no evidence that SCI Cresson lacks the resources to provide for Appellant's medical treatments and needs.

¶ 2 First, in order to interpret the phrase "modify the sentence" as used in 61 P.S. § 81, the majority examines the legislative history of that particular statute and "former statutes involving sentencing that were in existence when Section 81 was enacted[.]" I conclude that a reading of the plain language of section 81 as a whole reveals that the legislature intended to provide courts with discretion to modify only the place of confinement, not the length of confinement. *See, e.g., Commonwealth v. Lisboy*, 392 Pa.Super. 411, 573 A.2d 222, 223 (1990) (stating we are not to resort to examination of legislative history when meaning of statute is plain).

¶ 3 The following emphasized language in the statute militates in favor of this conclusion:

§ 81. Illness of prisoner; **removal** for treatment

Whenever any convict or person is confined in any jail, workhouse, reformatory, or reform or industrial school, penitentiary, prison, house of correction or any other penal institution, under conviction or sentence of a court, or is so confined while awaiting trial or confined for any other reason or purpose and it is shown to a court of record by due proof that such convict or person is seriously ill, and that it is **necessary that he or she be removed from such penal institution**, the court shall have power to modify its sentence, impose a suitable sentence, or modify the order of confinement for trial, as the case may be, **and provide for the confinement or care of such convict or person in some other suitable institution** where proper treatment may be administered. Upon the recovery of such person, the court **shall recommit him or her to the institution from which he or she was removed.**

61 P.S. § 81. As the majority notes, we turn to our rules of statutory interpretation to ascertain the meaning of a statute. Our obligation is to determine the legislature's intent and to effectuate that intent. *Commonwealth v. Berryman*, 437 Pa.Super. 258, 649 A.2d 961, 965 (1994). In doing so, "[w]e are to give the words of a statute their plain and ordinary meaning." *Id.* Also, "[t]he words are to be considered in their grammatical context." *Id.*

[S]ections of statutes are not to be isolated from the context in which they arise such that an individual interpretation is accorded one section which does not take into account the related sections of the same statute. Statutes do not exist sentence by sentence. Their sections and sentences comprise a composite of their stated purpose.

*Id.* (quoting *Commonwealth v. Lurie*, 524 Pa. 56, 569 A.2d 329, 331 (1990)). "Further, a statute should be interpreted as a whole, ... giving effect to all of its provisions if possible. Every word, sentence or provision of a statute is intended for some purpose and accordingly must be given effect." *Berryman*, 649 A.2d at 966 (citations omitted). "[L]anguage which is capable of more than one meaning can be clear and unmistakable in the context of its usage by the selection of the meaning which is neither forced nor strained." *Id.* In all, we are to give a statute the "most sensible construction possible." *Id.* Penal

statutes, in particular, are to be construed strictly. *Id.*

¶ 4 In my opinion, there is only one reasonable interpretation of section 81. When the plain language of section 81 is read as a whole, giving effect to each word, yet interpreting each word in the context of the entire section, the only reasonable conclusion is that the court is permitted only to alter the place of confinement of a seriously ill prisoner. Phrases in section 81 such as "recommit him or her to the institution from which he or she was removed," and "provide for care in some other suitable institution," instruct the court on how it is permitted to effectuate the purpose of section 81. This language reveals that the legislature intended only to allow courts to modify the place of confinement and only for so long as required to provide the necessary treatment to the prisoner that the original institution was unable to provide.

¶ 5 This conclusion is bolstered by the placement of section 81 in the scheme of our consolidated statutes. Title 61 is entitled, "Penal and Correctional Institutions," and Chapter 1 of Title 61 is entitled, "Reception and Care of Inmates Generally." Chapter 1 is divided into several sections, and section 81, in particular, falls under the general heading of "Transfer and Retransfer of Inmates." Sections included under this general heading are section 72 ("Transfer between institutions; petition and order; consent of common pleas; retransfer"); section 82 ("Escape of prisoner removed for treatment"); and, of course, section 81 ("Illness of prisoner; removal for treatment"). The headings under which section 81 are included refer only to the transfer of inmates from place to place, and make no reference to shortening of sentences for any reason.

¶ 6 Even if it were necessary to examine the legislative history of this particular statute, I do not believe that we should look at other sentencing statutes as they existed in 1919, which was the year section 81 was enacted. For example, the majority cites to the Act of February 28, 1905, P.L. 25, § 1, and explains that this statute (which was enacted in 1905 and in existence at the time section 81 was enacted), directed courts to sentence persons who were to be imprisoned for one or more years to the state penitentiary. I understand that statutes existed mandating the place of confinement for certain lengths of sentences and, as the majority notes, similar statutes exist today, *see* 42 Pa.C.S. § 9762; however, I do not agree that these other sentencing statutes have any bearing on our interpretation of section 81.

¶ 7 Finally, case law supports the conclusion that a court may only modify the place of confinement pursuant to section 81. In *Commonwealth v. Dunlavey*, 805 A.2d 562 (Pa.Super.2002), the appellant (Dunlavey) filed a petition under section 81 and the trial court granted the petition and modified Dunlavey's original sentence of seven to twenty years' imprisonment to fifteen years' probation. *Id.* at 563. In reversing the trial court's order, we stated:

> [a]ppellate courts have found that [section 81] applies only to those prisoners who become seriously ill while in prison and, for the benefit of the ill prisoner as well as the rest of the prison population, should be transferred temporarily to a more suitable institution where medical care can be administered properly. Further, the prisoners must allege that it is necessary for them to leave prison because the prison is unable to provide adequate medical care, and the prisoners must return when their medical treatment is complete.

*Id.* at 564. As we stated in *Dunlavey*, section 81 allows only for a *transfer* of a prisoner to a more suitable institution where his or her medical needs can be

met. Section 81 does not provide for the permanent release of a prisoner. *Id.* at 565 n. 6. Similarly, in *Commonwealth v. Tuddles,* 782 A.2d 560, 563 (Pa.Super.2001), we concluded that a petitioner, who sought release on house arrest or permission to leave the jail unattended for medical appointments, was not eligible for relief under section 81 because section 81 only provides a court with authority to transfer an inmate to " *'some other suitable institution* where proper care may be administered.'" *Id.* at 563 (quoting 61 P.S. § 81) (emphasis in original). Clearly, a plain reading of section 81 and reference to relevant case law reveals that courts do not have the discretion to shorten a judgment of sentence under section 81. For these reasons, it is not necessary to delve into the legislative history of section 81 to ascertain the meaning of this statute.

¶ 8 Secondly, in my view, there is no need to remand this case for an additional hearing. The trial court established a complete record by taking testimony and holding hearings, yet there is no evidence to support the trial court's grant of relief under section 81.

¶ 9 Section 81 requires a petitioner to show by "due proof" that he or she is "seriously ill" and "that it is necessary that he or she be removed from such penal institution," 61 P.S. § 81, "either because **the inmate's disease can not be treated in prison** or as a means of quarantine. The correct standard to have been applied is whether an inmate who has become seriously ill while in prison should be temporarily released to receive the necessary medical treatment." *Dunlavey,* 805 A.2d at 564 (emphasis added). *Cf. Commonwealth v. Lightcap,* 806 A.2d 449, 453 n. 2 (Pa.Super.2002) ("[Section] 81 does not require that the illness be 'new,' but only requires that it be serious. . . ."). In order to be eligible for relief, it is essential that a petitioner demonstrate that the prison medical system "is unable to provide him with adequate medical care[,]" or, in other words, that the prison medical system lacks the resources to provide the necessary treatment. *Id. See also Lightcap,* 806 A.2d at 451–52 ("In order to obtain relief under 61 P.S. § 81, a petitioner must make a *prima facie* claim for modification of sentence or transfer. To make a *prima facie* claim, a petition must allege that his current facility lacks the resources to treat him or that his illness compromises the collective health of the institution holding him.").

¶ 10 Complaints about inadequate medical care or about the quality of care received in the current facility do not establish a *prima facie* case for relief under section 81. *Lightcap,* 806 A.2d at 452–53; *Commonwealth v. Deaner,* 779 A.2d 578, 582 (Pa.Super.2001). In *Lightcap,* the appellant (Lightcap) petitioned for relief under section 81, alleging that his liver disease had progressed to the point where he was in need of a liver transplant and that the state correctional facility where he was incarcerated was unable to provide this treatment. We concluded that Lightcap's petition established a *prima facie case* for relief under section 81 and, since the trial court dismissed his petition without a hearing, we remanded for a hearing on the issue of what Lightcap's medical needs were and whether the state correctional institution where he was incarcerated was **capable** of meeting those needs. *Lightcap,* 806 A.2d at 453. Conversely, the petitioner in *Deaner,* who suffered from serious complications related to diabetes, failed to establish a *prima facie* case for relief under section 81 because he merely raised numerous allegations of inadequate care, rather than asserting that the prison lacked the resources to treat him or that his illness compromised the collective health of the prison population. *Deaner,* 779 A.2d at 582 (Pa.Super.2001). *See also Tuddles,* 782 A.2d at 563 (concluding peti-

tioner not eligible for relief under section 81 where "sole complaint [was] neglect in treatment and medication, which [was] capable of being remedied without transfer").

¶ 11 In the instant case, the trial court concluded that Appellant's precarious medical condition requires attention and monitoring only available outside the prison setting, *see* T.C.O., 5/1/01, at 4, but the record lacks evidence that SCI Cresson was unable to, or lacked the resources, to provide the care required by Appellant.[12] The focus of the trial court, as evidenced in its opinion and supplemental opinion, was on the gravity of Appellant's medical condition. The Commonwealth stipulated that Appellant's condition was chronic and serious. Accordingly, the remaining issue was whether SCI Cresson has the resources to treat Appellant.

¶ 12 Appellant presented the expert opinion and testimony of Carla G. Fox, M.D. Dr. Fox, an internal medicine practitioner in California, submitted a written medical opinion based on her review of Appellant's medical records. In her opinion, Dr. Fox expressed concerns about the quality of Appellant's treatment. *See* Letter from Dr. Fox to the Honorable Judith Freidman (Dr. Fox Letter), 12/4/00. She opined that Appellant should be under the care of a cardiologist and expressed concern about the doses and types of medications ordered for Appellant. *Id.* She admitted that she was unfamiliar with the formulary of medications available to prisoners at SCI Cresson, yet she concluded that Appellant was not receiving "first-line cardiac medications." *Id.* at 2. In Dr. Fox's deposition however, she admitted that Appellant's current medications were

appropriate for his condition. N.T. Deposition of Dr. Fox, 7/25/00, at 7. After explaining the various diseases from which Appellant suffers, including, *inter alia,* arteriosclerosis, peripheral vascular disease, chronic obstructive pulmonary disease, arthritis, carpel tunnel syndrome, back pain, esophageal reflux, colon polyps, and kidney problems, Dr. Fox indicated that the treatment Appellant was receiving in prison was "good" and that the treating physicians were "diligent and caring." *Id.* at 20. Notably, she concluded that "[n]ot everything is available, and they [the prison medical staff] have to work within a framework of a bureaucracy which I'm sure isn't easy. I have no real knowledge of what care delivery requires in that setting." *Id.* However, Dr. Fox failed to indicate specifically what treatments Appellant required that were "not available" to him in prison. *Id.*

¶ 13 Moreover, Dr. Fox was admittedly unfamiliar with the medical resources available at the prison. *Id.* at 20, 36. For example, Dr. Fox was unable to comment on the availability of Cardizem, a cardiac medication that Appellant's treating physician discontinued for medical reasons. *Id.* at 22. She merely speculated that Appellant may benefit from the Cardizem, but admitted that Appellant had problems with headaches and low blood pressure while he was on it. *Id.* The key question on that particular issue was whether Cardizem is necessary for Appellant and available at SCI Cresson, and there was simply no evidence presented by Appellant to resolve either question other than Dr. Fox's speculation on the issue. In fact, information in the record implies that Cardizem is an available medication in the prison formu-

---

**12.** Similarly, in its supplemental opinion, the trial court concluded that Appellant's condition has worsened since he has been imprisoned and "[t]he monitoring and balancing required to keep him alive will be more diffi-

cult with each passing day. The prison system does not have the resources to provide the skilled nursing [Appellant] *now* requires." T.C.O. Supplemental, 8/27/01, at 3.

lary. *Id.* at 34. Overall, Dr. Fox agreed that Appellant's heart condition was inoperable and his other conditions would not change in a setting outside of prison, other than maybe his depression. *Id.* at 33. Dr. Fox further admitted that Appellant's heart condition dates back to at least 1985, and that he has been receiving appropriate treatment during the time he has been incarcerated. *Id.* at 35. Finally, Dr. Fox admitted that Appellant was getting the same treatment inside prison as he would get from some physicians outside of prison. *Id.* at 38.

¶ 14 Dr. Fox also indicated that Appellant's anger and frustration about being imprisoned would likely "precipitate episodes of angina and ischemia...." Dr. Fox Letter at 3.[13] Dr. Fox concluded that "despite the sincerity and diligence of [Appellant's] caregivers, [she believes] to a reasonable degree of medical certainty that [Appellant's] situation does not allow for adequate medical management or adequate control of environmental factors to manage his severe cardiovascular disease." *Id.*

¶ 15 Anton O. Skerl, M.D., Appellant's treating prison physician, submitted a letter in response to Dr. Fox's opinion. Letter from Dr. Skerl to Rebecca D. Spangler, A.D.A., 1/3/01. Dr. Skerl explained that the adjustments in Appellant's medications were based on medical reasons. *Id.* For example, Dr. Skerl decreased Appellant's Lopressor dose due to his low blood pressure. *Id.* Dr. Skerl also stated that Appellant was having "infrequent chest pain requiring only about one nitroglycerin pill a week," and concluded that Appellant is "getting more than adequate care." *Id.* On June 27, 2001, Dr. Fox submitted another letter indicating that Appellant's "inoperable coronary disease characterized by persistence of chest pain due to incomplete

control of ischemia" at rest could lead to coronary spasm, further ischemia, and lethal cardiac arrhythmias. Letter from Dr. Fox, 6/27/01. She concluded that this condition is aggravated by stress and that Appellant requires a restful, non-stressful environment. *Id.* She further concluded that "[a]lthough [Appellant] has survived to the present time in his present environment, he is substantially more likely to die suddenly while in prison than in the less stressful nursing home environment." *Id.*

¶ 16 Overall, the record reveals three areas of concern pertaining to Appellant's health: (1) medication management and monitoring of Appellant's condition; (2) availability of specialists, such as a cardiologist; and (3) effects of the stress of incarceration on Appellant's health. However, the record does not answer the essential issue in this case, *i.e.*, whether SCI Cresson has the available resources to address these areas of concern. In other words, can SCI Cresson provide, for example, the following: (1) necessary medications; (2) appropriate level of monitoring such as the taking of Appellant's vital signs as often as medically necessary; and (3) consultation and regular follow-up with a cardiologist, if necessary? Are there ways to decrease the stress of incarceration that are suitable for Appellant's condition, such as separating him from the general population or providing him with his own cell? What kind of care is being provided in a skilled nursing facility that is necessary for Appellant and can not be provided at SCI Cresson? These kinds of questions go directly to an essential inquiry under section 81, *i.e.*, whether SCI Cresson has the available resources to provide for Appellant's medical needs. The record is simply devoid of any evidence that SCI Cresson lacks the resources to provide the neces-

---

**13.** Appellant's counsel argued that Appellant "suffers from a situation where the very fact

of his incarceration is a serious threat to his health." N.T. Petition Hearing, 2/2/01, at 36.

sary medical care for Appellant. Instead, the focus of the expert opinions, testimony, and hearings was on the gravity of Appellant's condition and complaints about the quality of care received at SCI Cresson. Even if SCI Cresson is providing inadequate care, yet has the resources to provide the necessary care, relief is not available under section 81. In my view, Appellant failed to establish that his "disease can not be treated in prison." *See Dunlavey*, 805 A.2d at 564. Accordingly, I would reverse the trial court's order granting relief under section 81.